Carolyn **BELL** and **Maryland Welfare Rights Organization (Individually and on behalf of all others similarly situated)**

v.

Kalman R. **HETTLEMAN, Secretary, Maryland Department of Human Resources (Individually and in his official capacity)**

and

Richard S. **Schweiker, Secretary of the United States Department of Health and Human Services (In his official capacity).**

Civ. No. K–82–2369.

United States District Court,
D. Maryland.

Jan. 31, 1983.

Peter M.D. Martin, Myrna A. Butkovitz and Dennis W. Carroll, Baltimore, Md., for plaintiffs.

Stephen H. Sachs, Atty. Gen. of Maryland, Dennis M. Sweeney, Joel J. Rabin and Nancy B. Shuger, Asst. Attys. Gen., Baltimore, Md., for defendant Kalman R. Hettleman.

J. Frederick Motz, U.S. Atty., Glenda G. Gordon, Asst. U.S. Atty., Baltimore, Md. and Diane C. Moskal, Regional Atty, U.S. Dept. of Health and Human Services, Philadelphia, Pa., for defendant Richard S. Schweiker.

FRANK A. KAUFMAN, Chief Judge.

On August 13, 1982, plaintiffs filed a complaint against the Secretary of the Maryland Department of Human Resources (DHR), (the state defendant), individually and in his official capacity, charging that the method used by that state agency to compute eligibility and the amount of benefits to be paid under the Aid to Families with Dependent Children (AFDC) program violates Federal statutes and regulations, because the state defendant considers mandatorily withheld taxes (state, local and federal income taxes and Social Security or Federal Insurance Contributions Act (F.I.C.A.) taxes) as income available to an AFDC family with an employed person. Plaintiffs are Carolyn Bell, a working AFDC recipient whose grant amount has been diminished as a result of defendant's inclusion of withheld taxes within the definition of income, and the Maryland Welfare Rights Organization, which includes at least three members who are adversely affected by application of the state defendant's challenged policy. The state defendant has estimated that there are over 3,000 open AFDC cases statewide in which one parent has earnings. Plaintiffs sought, and this Court has certified, pursuant to Fed.R. Civ.P. 23(b)(2), a class composed of

all persons in the State of Maryland (a) who have applied or will apply for AFDC benefits, (b) who have been or will be employed during the period for which they have applied for AFDC, (c) whose earnings were subject to mandatory state, local, federal, or F.I.C.A. income tax withholding, (d) whose AFDC bene-

fits have been or will be denied, reduced or terminated on or after the ninetieth day prior to the filing of this action due to defendant's policy of counting F.I.C.A., state, local, or federal income taxes, mandatorily deducted from an individual's gross earnings, as income available to those persons in computing the amount of their monthly AFDC checks, and (e) who would be eligible for AFDC or for an increased amount of AFDC but for the policy of defendant which is challenged in this action.[1]

Plaintiffs ask for preliminary and permanent injunctive relief and a declaratory judgment that defendant's policy of counting federal, state, and local income and F.I.C.A. taxes mandatorily deducted from earnings, as income available to plaintiffs, is contrary to 42 U.S.C. § 602(a)(7) and an implementing regulation, 45 C.F.R. § 233.-20(a)(3)(ii)(D), as amended 47 Fed.Reg. 5675 (Feb. 5, 1982). Plaintiffs also seek an Order from this Court requiring the state defendant prospectively to restore plaintiff and all members of the class to AFDC grant amounts calculated by subtracting allowable deductions from gross earnings minus mandatorily withheld taxes and requiring the state defendant to send relief notices to all members of the class whose AFDC applications have been denied or whose AFDC grants have been terminated or reduced within ninety days before the filing of this action.[2] Jurisdiction in this case exists pursuant to 28 U.S.C. §§ 1331 and 1343(3).

After the inception of the within case, the Secretary of the Department of Health and Human Services (DHHS) (the federal defendant) was joined as an additional defendant. The federal defendant has filed a motion for summary judgment. The state defendant has moved to dismiss the within action pursuant to Fed.R.Civ.P. 12(b)(6) for failure of plaintiffs to state a claim upon which relief can be granted. That latter motion will be treated as one for summary judgment under Fed.R.Civ.P. 56 because numerous documents, other than pleadings, are included in the present record in this case. The relevant and material facts are not in dispute. The legal issues can be succinctly stated as follows:

(1) Are mandatorily withheld tax deductions (a) "income" as that word is used in 42 U.S.C. § 602(a)(7) and/or (b) "earned income" as those words are used in 42 U.S.C. § 602(a)(8)? If the answer to that question is "yes", (2) are such tax deductions included within the flat $75.00 disregard for work expenses established by the 1981 amendment to 42 U.S.C. § 602(a)(8)? The answer to both questions is "yes."

Four federal district courts have already dealt with those issues[3] and have divided with two on each side. In the first, *Ram v. Blum,* 533 F.Supp. 933 (S.D.N.Y.1982), Judge Ward issued a preliminary injunction as requested by plaintiffs. In the second, *Dickenson v. Petit,* 536 F.Supp. 1100 (D.Me. 1982), Judge Cyr denied plaintiff's motion for preliminary injunction (no appeal has seemingly been taken from that portion of the order). In the third, *James v. O'Bannon,* 557 F.Supp. 631, Civil No. 82–1588 (E.D.Pa. filed June 18, 1982), Judge Pollak also denied plaintiff's motion for preliminary injunction and granted defendant's motion for summary judgment (presently on appeal to the Third Circuit). Finally, in *Turner v. Woods,* Civil No. 81–4457 (N.D. Cal. filed July 29, 1982), Judge Henderson

---

1. The class includes people whose AFDC grants have been adversely affected ninety days before the filing of this case by the policy challenged herein. The ninety day period was requested by plaintiffs and utilized by this Court because a welfare claim is not finally denied until ninety days after the termination or reduction of benefits, when the appeal period expires. Thus, when the complaint was filed in the within case, each class member's AFDC case was still a live claim.

2. *See* n. 1.

3. In addition, the federal defendant informed this Court on December 6, 1982 that three more cases involving the issues in this case had recently been filed: *Nishimoto v. Sunn,* C.A. No. 82–0359 (D.Hawaii); *David v. Kheder,* C.A. No. 82–71747 (E.D.Mich.); and *Gaston v. Schweiker,* C.A. No. 82–1337 (N.D.Ohio), but that no preliminary or final dispositions had then been made in any of those cases.

entered a permanent injunction against the state defendants, prohibiting them from including mandatory payroll deductions within the definition of "income," and enjoined the federal defendant from terminating federal matching. (Presently on appeal to the Ninth Circuit.) This Court, for reasons set forth *infra,* comes to the same conclusions as those reached in *Dickenson* and *James.*

The controversy in those four cases and in the within case was generated by the passage in 1981 of the Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub.L. No. 97–35, 95 Stat. 357 (1981). OBRA effected certain cost-savings changes in AFDC which were intended to limit the AFDC program to the "truly needy" by, among other things, eliminating some work incentive disregards from the program. Underlying those OBRA changes was the seeming assumption that working AFDC recipients whose earned income is supplemented by AFDC are less needy than persons who are not working. The specific statutory change at issue is the conversion from a so-called open-ended work expense disregard (a deduction of *all* expenses reasonably related to the earning of income from total earnings in calculating the AFDC grant amount) to a flat $75.00 maximum work expense disregard, regardless of the actual amount of a working AFDC recipient's work-related expenditures. In certain instances, that change caused an actual reduction in the amount of money available to an AFDC household; in others it resulted in total ineligibility for AFDC benefits. Under pre-OBRA law, as interpreted by the Supreme Court, the states were not permitted to place any " . . . limitation, apart from that of reasonableness, . . . upon the recognition of expenses attributable to the earning of income." *Shea v. Vialpando,* 416 U.S. 251, 260, 94 S.Ct. 1746, 1753, 40 L.Ed.2d 120 (1974). In *Shea,* Justice Powell explained (at 253–54, 94 S.Ct. at 1750):

Under HEW regulations all AFDC plans must specify a statewide standard of need, which is the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level. Both eligibility for AFDC assistance and the amount of benefits to be granted an individual applicant are based on a comparison of the State's standard of need with the income and resources available to that applicant. 45 CFR § 233.-20(a)(2)(i). The "income and resources" attributable to an applicant, defined in 45 CFR §§ 233.20(a)(6)(iii–viii), consist generally of "only such net income as is actually available for current use on a regular basis . . . and only currently available resources." 45 CFR § 233.-20(a)(3)(ii)(c). . . . In determining net income, any expenses reasonably attributable to the earning of income are deducted from gross income. 42 USC § 602(a)(7) [42 USCS § 602(a)(7)]. If, taking into account these deductions and other deductions not at issue in the instant case, the net amount of "earned income" is less than the predetermined statewide standard of need, the applicant is eligible for participation in the program and the amount of the assistance payments will be based upon that difference. 45 CFR §§ 233.20(a)(3)(ii)(a) and (c).

By way of contrast, AFDC claimants since the passage of OBRA, are no longer able to obtain AFDC benefits reflecting the full value of actual work-related expenses deducted from their earnings. Plaintiffs argue in this case that mandatorily withheld tax deductions are not income at all, and that any such withholding should be subtracted from gross pay *before* the flat $75.00 maximum work expense disregard is applied.[4]

At issue in this litigation is the question of whether Congress intended "income", as

---

4. Plaintiff Bell's monthly mandatorily withheld payroll tax deductions would be $46.22 out of her gross monthly earnings of $617.05, if she claimed all six dependents to which she is entitled. Her monthly out-of-pocket work expenses are $92.00, not counting $172.00 for child care, which is fully deductible under both pre and post-OBRA law. Plaintiff's withholding plus monthly work expenses total $138.22. Thus, if the flat $75.00 work expense disregard is designed to include mandatorily withheld taxes, the government allowable disregard falls $63.22 short of meeting plaintiff's actual work-related expenses.

used in 42 U.S.C. § 602(a)(7), to mean gross, or on the other hand, after-tax income. That section of the Social Security Act, as originally passed in 1939, read as follows:

(7) provide that the State agency shall, in determining need, take into consideration any other income and resources of any child claiming aid to dependent children;

In 1962, that section was amended to state as follows:

(7) provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, as well as any expenses reasonably attributable to the earning of any such income; ...

In 1968, § 602(a)(7) was further amended to link it with a revised § 602(a)(8) which detailed disregards of earned income:

(7) except as may be otherwise provided in clause (8), provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, ... as well as any expenses reasonably attributable to the earning of any such income; (8) provide that, in making the determination under clause (7), the State agency—

(A) shall with respect to any month disregard—

(i) ... and (ii) in the case of earned income of a dependent child ... [or] a relative receiving such aid ... the first $30 of the total of such earned income for such month plus one-third of the remainder of such income for such month ....

In 1981, §§ 602(a)(7) and 602(a)(8) were amended to provide as follows:

(7) except as may be otherwise provided in paragraph (8) ... provide that the State agency—

(A) shall, in determining need, take into consideration any other income

and resources of any child or relative claiming aid to families with dependent children ....

\*   \*   \*   \*   \*   \*

(8)(A) provide that, with respect to any month, in making the determination under paragraph (7), the State agency—

(i) ... (ii) shall disregard from the earned income of any child or relative applying for or receiving aid to families with dependent children ... the first $75 of the total of such earned income for such month (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month); (iii) shall disregard from the earned income of any child, [or] relative ... an amount equal to expenditures for care in such month for a dependent child ... receiving aid to families with dependent children and requiring such care for such month, to the extent that such amount (for each such dependent child ...) does not exceed $160 (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month); and (iv) shall disregard from the earned income of any child or relative receiving aid to families with dependent children ... an amount equal to the first $30 of the total of such earned income not already disregarded under the preceding provisions of this paragraph plus one-third of the remainder thereof ....

The 1939 enactment required the states to take into account, "in determining need" of the child, "any other income and resources." The phrase "any other income and resources" has remained the same to the present. Plaintiff urges that a 1940 Social Security Board policy statement [5]

---

**5.** The relevant parts of that Board policy statement are as follows:

    The policies and procedures adopted by the State agency shall be consistent with the

following criteria for the consideration of income and resources in the determination of need:

and 45 CFR § 233.20(a)(3)(ii)(D) [6] are controlling; that the intention of the Congress which passed that section of the act in 1939, upon the Board's recommendation, was that only income actually available to a recipient should be counted in the eligibility and benefit determination; and that mandatorily withheld tax deductions are not in any sense actually available or in hand income.[7] The difficulty with plaintiff's approach is that it is inconsistent with legislative history and court decisions during approximately the last twenty years.

42 U.S.C. § 602(a)(7) was amended in 1962 to require the states to "take into consideration ... any expenses reasonably attributable to the earning of ... income." Justice Powell, for a unanimous Supreme Court in *Shea,* wrote that the term "income" in 42 U.S.C. § 602(a)(7), in reference to the law in force and effect after the 1962 amendment, meant "gross income":

> In determining net income, any expenses reasonably attributable to the earning of income are deducted from *gross* income.
>
> \*    \*    \*    \*    \*    \*

(a) The income or resource shall actually exist. Attributing a definite amount of income to sources or to kinds of property that produce either no income or less than the amount attributed to them is fictitious and such an imputed amount cannot properly be considered as an actual resource.

(b) The income or resource shall be available to the applicant. To be regarded as available, an income or resource must be actually on hand or ready for use when it is needed. Consideration does not mean attributing a resource to sources from which income, contributions, maintenance, or support are not in fact available and forthcoming. Nor does it mean including as available for conversion to cash, ownership in real and personal property that is already meeting established requirements of the needy person or family.

(c) The income or resource shall have some appreciable significance in meeting the requirements of the applicant. The amendments are not intended to require State agencies to bring inconsequential resources under scrutiny in establishing need, such as those resulting from casual earnings, small and unpredictable gifts of indeterminate value, or past income that will not continue in the future.

(d) The income or resource shall be considered from the standpoint of its conserva-

The Social Security Act of 1935, as originally enacted, 49 Stat 620, did not expressly require that States allow AFDC beneficiaries to deduct from *gross* income expenses incurred in connection with the earning of income....

As part of a general amendment of the Act in 1962, Pub L 87–543, 76 Stat 185, Congress made mandatory the widespread but then optional practice of deducting employment expenses from *total* income in determining eligibility for assistance.

416 U.S. at 254, 258–60, 94 S.Ct. at 1750, 1752–53 (emphasis added).

It is true that the Department of Health, Education and Welfare (HEW) Handbook of Public Assistance Administration, published in 1963, interpreted the newly enacted work-expense deduction and did not list withheld taxes as "expenses reasonably attributable to the earning of such income." Further, an HEW report, "State Methods for Determining Need in the Aid to Dependent Children Program," Public Assistance Report No. 43, published in March,

tion and its maximum utilization in the interest of the welfare of the applicant. The effect of the resource on need should be taken into full consideration both in regard to the requirements that it provides on the one hand, and the expenses that are associated with the applicant's obtaining, conserving, or utilizing it on the other.

6. 45 CFR § 233.20(a)(3)(ii), as amended 47 Fed. Reg. 5675 (Feb. 5, 1982), provides in pertinent part that "in determining need and the amount of the assistance payment, after all policies governing the reserves and allowances and disregard or setting aside of income and resources referred to in this section have been uniformly applied: ... (D) *Net income available for current use and currently available resources shall be considered; income and resources are considered available both when actually available* ..." (emphasis added). A form of the regulation has existed since July, 1967.

7. Income tax withholding did not begin until 1943, several years after the enactment in 1939 of the section of the law at issue. While certain social security withholdings began as early as 1937, such mandatory payroll deductions were not generally encountered in 1939, especially not by welfare recipients.

1961, states that during the period May-July, 1959, the states used the term "gross income" to refer to "take-home pay" after payroll deductions and the term net income to refer to amounts available after "other employment costs have been recognized." *Id.* at 25. However, by 1974, when *Shea* was decided by the Supreme Court, the states were lumping together mandatorily withheld taxes with other work expenses and thus including such taxes as expenses reasonably attributable to the earning of income.[8] Justice Powell seems to have implicitly recognized that in *Shea* when he wrote:

> Prior to May, 1970, Colorado's AFDC regulations permitted the deduction from income of all expenses reasonably attributable to employment, including but not limited to the actual cost of transportation, if "essential to retain employment." Child care expenses and *mandatory payroll deductions were also treated as employment related expenses,* and all such expenses were computed on an individualized basis.
>
>   *   *   *   *   *   *

Thus, while Colorado continued to allow individualized treatment of mandatory payroll deductions and child care costs, *all other work related expenses* were subjected to a uniform allowance of $30, even if an applicant could prove actual expenses in excess of that figure. The Regional Commissioner of the Social and Rehabilitation Service of HEW thereafter accepted the incorporation of this provision into Colorado's AFDC plan.[3]

[3] According to HEW, 20 States, including Colorado, presently employ a standard work-

**8.** Federal defendant's exhibit IV is entitled "Summary of State Agency Policy on Expenses Reasonably Attributable to the Earning of Income," dated January, 1972. In almost every state, taxes or "mandatory payroll deductions" were by 1972 included in the list of work expenses. State defendant's exhibit 6 is an analysis prepared by the Social Security staff for the staff of the Senate Finance Committee relating to the treatment of work expenses and dated March 22, 1978. That analysis concludes that "[a]ll states consider State, Federal and Social Security taxes as expenses of employment." Eighteen states are listed as utilizing flat deductions which include in their dollar limits

expense allowance in combination with actual child care expenses, *and in some cases mandatory payroll deductions,* and an additional 15 States use other systems of mandatory standard allowances for one or more major items of work expense.

416 U.S. at 254–55, 94 S.Ct. at 1750–51. (emphasis added) (footnote omitted).

In *Shea,* the Supreme Court also implicitly approved HEW's implementing regulation, in which "earned income" was defined as gross income, irrespective of income tax deductions:

> Congress has been careful to ensure that *all* of the income and resources properly attributable to a particular applicant be taken into account, and this individualized approach has been reflected in the implementing regulations. For example, HEW's broad definition of "earned income" . . ., and its more specific descriptions of commissioned, salaried, and self-employment derived income in 45 CFR § 233.20(a)(6)(iv–viii),[10] demonstrate its view that the determination of need in each case is to be based upon an assessment of the particular individual's available income and resources.

---

[10] Title 45 CFR § 233.20(a)(6) provides in part:

     *    *    *

"(iv) With reference to commissions, wages or salary, the term *'earned income' means the total amount, irrespective of personal expenses, such as income tax deductions,* lunches and transportation to and from work, and irrespective of expenses of employment which are not personal, such as the cost of tools, materials, special uniforms, or transportation to call on customers." [9]

416 U.S. at 261–62, 94 S.Ct. at 1754 (emphasis added).

mandatory payroll deductions. (Of course, according to the Supreme Court decision in *Shea, supra,* all states which used standard work expense allowances were at that time required to permit deductions in excess of the amount specified when expenses were actually incurred, verified as necessary, and reasonable."

**9.** The words "personal expenses" defined in 45 CFR § 233.20(a)(6), quoted at *Shea* n. 10, were also used in 45 CFR § 233.20(a)(7), promulgated in 1969 and in force and effect at the time of the passage of OBRA, which provided:

  (7) Disregard of earned income; method. (i) Provide that the following method will be

■ The word "income" is used in 42 U.S.C. § 602(a)(7). The words "earned income" are used in 42 U.S.C. § 602(a)(8). § 602(a)(7) has since 1968 contained the direction that where § 602(a)(8) applies, *i.e.,* to earned income, calculations are to be made not under (a)(7) but under (a)(8).[10] Subsection (a)(8) states:

> (8)(A) provide that, with respect to any month, in making the determination under paragraph (7), the State agency—
>
> (ii) shall disregard from the earned income of any child or relative applying for or receiving aid to families with dependent children . . . the first $75.00 of the total of such earned income for such month (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month);

"Income" includes unearned as well as earned income. Thus, "earned income" is a subset within "income." It is difficult if not impossible to read the words "income" or "earned income" as not including income tax deductions. *See* 45 CFR § 233.-20(a)(6)(iv) (1981), quoted by Justice Powell in *Shea* 416 U.S. at 261 n. 10, 94 S.Ct. at 1754 n. 10.[11] Thus, returning to the first of the two questions posed *supra* at page 390, the answer is that mandatory tax deductions are included in and are not excluded from "income" (*see* subsection 7) and "earned income" (*see* subsection 8).

■ As to the second question posed *supra* at page 388, there is every indication that Congress intended that the flat $75.00 disregard or standard work-expense deduction should not be augmented by all or any part of mandatorily withheld taxes. It can be argued that the congressional motive in 1981 of avoiding administrative complexity and of curbing abuse, which seemingly, at least in part, motivated the enactment of the flat $75.00 disregard, is not served by including mandatorily withheld taxes within the umbrella of the $75.00 figure, since the amounts of such withholdings are easily verifiable.[12] It can also be argued in relation to cost savings, that there are sufficient cost savings in other changes incorpo-

---

used for disregarding earned income: The applicable amounts of earned income to be disregarded will be deducted from the gross amount of "earned income," and all work expenses, personal and nonpersonal, will then be deducted. Only the net amount remaining will be applied in determining need and the amount of the assistance payment.

**10.** *See* the introductory "except" phrase of subsection (a)(7). That sub-section is set out in full in the body of the text of this opinion at page 390 *supra.*

**11.** Quoted in the body of the text of the within opinion at page 393.

**12.** A statement in the 1981 committee reports seems to support the position, however, that disregards were to be subtracted from gross income:

DISREGARDS FROM EARNED INCOME
(Section 751 of the Bill)

Present Law.—In determining AFDC benefits, States are required to disregard from the recipient's *total* income: (1) the first $30 earned monthly, plus one-third of additional earnings; and (2) any expenses (including child care) reasonably attributable to the earning of such income. . . .

S.Rep. No. 97-139, 97th Cong., 1st Sess. 501, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 767 (emphasis added).

*See also* Report of the House Committee on Ways and Means accompanying H.R. 6369 (May 25, 1982) which was not enacted. That bill proposed to restore the work incentives removed from the AFDC program by OBRA. In a chart comparing the bill with law prior to OBRA, the Committee noted that under prior law:

There was no statutory limit on the amount of gross income a family could have and still remain on AFDC. In determining eligibility and benefits, the earned income disregards summarized above were applied.

Recipients became ineligible for benefits at the point their "countable income" (*gross income minus the disregards*) equaled the State maximum AFDC benefit amount.

H.R.Rep. No. 97-587, Pt. 1, 97th Cong., 2nd Sess. 6 (1982) (emphasis added).

*See also* the same Committee's statement concerning the introduction of earnings disregards into the AFDC program, which specifically refers to mandatory tax deductions as work-related expenses:

Prior to Federal amendments enacted in the 1960's, if an AFDC parent took a job, the family's AFDC benefits were reduced dollar-for-dollar by the amount of any earnings. In

rated in OBRA.[13] But the legislative history of OBRA shows that Congress did relate the $75.00 flat disregard to cost savings, and that Congress intended to discourage people from remaining on welfare as a supplement to working, by cutting back sharply on work incentive disregards. Thus, defendant Schweiker stated to the House Ways and Means Committee in support of the Administration's AFDC proposals:

> The American people strongly oppose assistance going to those who can work, those who have other sources of income, and those who get as much or more on welfare as others get from working.

> In AFDC, the proposals are designed to improve the program by limiting eligibility to those most in need, strengthening work requirements, making AFDC a temporary safety net for those who are not economically independent, emphasizing individual responsibilities, and improving administration.

> Our proposal contains a number of provisions designed to limit eligibility and to better target limited funds to those most in need. The generous disregards applied to earned income under current law, for example, have allowed AFDC recipients who join the work force to continue to receive public assistance even after they are working full time. Furthermore, the present policy on treatment of work expenses, which does not define or limit what types of expenses may be disregarded, prevents the use of reasonable con-

---

other words, there was no net financial gain from working. Furthermore, *any work-related expenses—such as transportation and child day care costs, and mandatory tax and other wage deductions—could result in the family* actually having less net or disposable income than if the parent did not work. In order to insure that taking a job would increase an AFDC family's disposable income, Federal amendments enacted in 1962 and 1967 required States to apply certain procedures (i.e., earnings disregards) in determining the monthly benefit level of an eligible AFDC family in which a member was employed. These amendments required that certain amounts of earnings not be counted against, or reduce the family's monthly AFDC benefit. That is, certain amounts of monthly earnings had to be disregarded in determining the AFDC payment so the family would have a higher amount of disposable income (wages minus work expenses plus AFDC benefits) because of the earnings; and, therefore, there would be a positive financial incentive for AFDC parents to seek employment.

Prior to enactment of the Omnibus Budget Reconciliation Act of 1981 (P.L. 97–35), in determining a working AFDC family's benefit level for a month, States were required to reduce the State monthly payment by the amount of the family's earnings that remained after the following amounts had been excluded or disregarded: (1) the first $30 of earnings; (2) plus one-third of remaining earnings; (3) plus work expenses for the month (any expenses, including child day care, reasonably attributable to the earning of income). (The $30 plus one-third disregards could be applied in determining the monthly benefit only if the family was determined to be eligible for AFDC without the application of these disregards.)

*Id.* at 12 (emphasis added).

"[A]lthough committee reports commenting on a previously enacted statute are said not to be part of the legislative history of that statute, they are nevertheless 'entitled to some consideration as a secondarily authoritative expression of expert opinion'." 2A C.D. Sands, *Statutes and Statutory Construction, A Revision of the Third Edition of Sutherland Statutory Construction* § 48.06 (4th ed. 1973) (footnote omitted). In this instance, since the same House Committee, which in 1981 had considered the 1981 legislation, sought unsuccessfully in 1982 to have enacted into law a change in the 1981 statute, that committee's 1982 report would seem particularly pertinent.

The Federal defendant has submitted an affidavit from JoAnne Ross, The Deputy Associate Commissioner for Family Assistance, Social Security Administration, DHHS, in which it is stated that cost savings estimated by the Administration and by the Congressional Budget Office for the changes in earned income disregards made by OBRA were based on the application of the $75.00 disregard to gross earnings, not earnings net of mandatory tax deductions. Plaintiffs assert that the Ross affidavit is defective in that it contains vague, unsubstantiated statements, does not contain the supporting data on which her conclusions are based and her personal knowledge of the matters asserted is not clear. Since there is other evidence in the record of legislative history, the affidavit is simply cumulative, and is not relied upon by this Court in reaching its decision herein.

13. *See, e.g.,* the "$30 and one-third" income disregard discussed by Secretary Schweiker at p. 395, *infra.*

trols, while contributing to the administrative burden.

We propose to change the earned-income disregard. To determine the basic eligibility for the AFDC program, we would deduct from an applicant's monthly earnings $75 for work expenses and no more than $50 per child for child care for those found eligible. We would then, in calculating the benefit amount, deduct an additional $30 and one-third of the remainder of the earnings.

The new formula will reduce or eliminate benefits to those at higher levels. This change standardizes work and child-care expenses. Also, the $30 and one-third now disregarded as a work incentive will be computed on net income, rather than gross as is presently done, and will not apply to earnings already disregarded for work expenses and child care.[14]

*See also* the following response by the Secretary to subsequent questioning when he appeared before the Senate Finance Committee:[15]

Question 1. The Administration proposes to cut back substantially on the earnings disregards that determine initial eligibility for AFDC as well as on the work incentive deductions considered in computing AFDC grant supplements. This will make many people ineligible for AFDC if they have jobs and substantially reduce the AFDC supplement grants of many others. Won't this approach force many mothers ruled ineligible for an AFDC grant to abandon work in favor of full dependence on AFDC in order to preserve their Medicaid eligibility? Won't substantially reduced AFDC grants for working mothers who do qualify make it uneconomical to work and force them to leave work in favor of full dependence on AFDC?

Answer. Anyone receiving AFDC benefits who voluntarily leaves a Win job without good cause can be subject to sanctions and removal from the grant if he/she refuses to participate. The same sanctions will apply to persons refusing to participate in CWEP. Further, in the 33 States that provide medicaid to individuals not eligible for a federal cash assistance program, AFDC ineligibility does not automatically result in medicaid ineligibility.

\* \* \* \* \* \*

The potential disincentives to work embodied in the Administration's income disregard cost-cutting proposals were emphasized by speaker after speaker during the congressional hearings. Further, several of the individuals representing national advocacy groups brought to the attention of the committees that $75.00 was an unrealistically low figure and that it included mandatorily withheld taxes.[16]

There are cases decided both before and after *Shea* which have interpreted 42 U.S.C.

14. *Administration's Proposed Savings in Unemployment Compensation, Public Assistance, and Social Services Programs: Hearings Before the Subcommittee on Public Assistance and Unemployment Compensation of the Committee on Ways and Means, House of Representatives,* 97th Cong., 1st Sess. 6–7 (1981).

15. *Spending Reduction Proposals, Hearings Before the Committee on Finance, United States Senate,* Part 1, 97th Cong., 1st Sess. 10 (1981).

16. For example, the statement of Christine Pratt-Marston, on behalf of the National Anti-Hunger Coalition:

In place of the current system, which encourages AFDC women to take low paying jobs by recognizing that even those jobs involve costs, the Reagan Administration proposes to operate AFDC in a world which does not exist, that is, a world in which full time day care can be purchased for $50 a month, and *in which the combination of Social Security and FICA taxes, transportation, and uniforms or other mandatory payroll deductions will never exceed $75 a month.* Any working AFDC mother whose work-related expenses exceed those amounts will either have to absorb the costs out of minimum wage or lower earnings, or will have to quit working. . . .

Hearings, Committee on Ways and Means, *supra* note 14, at 88–89 (emphasis added).

Marian Wright Edelman, President of the Children's Defense Fund, testified as follows before both the Senate Finance Committee and the Committee on the Budget of the House, and introduced a "Children's Defense Budget" as a proposed alternative:

3. *These cuts will gut income disregards which now encourage AFDC parents to work.*

§§ 602(a)(7) and (8), in their pre-OBRA stance, to exclude from "earned income" all earnings not available in fact to the child in question.[17] *Shea* applied pre-OBRA law so as to require the then existing open-ended disregard to include all work-related expenses as not available for the child in a post-work context. But Congress, in enacting OBRA, substituted a flat maximum $75.00 disregard for the prior existing open-ended disregard, and in no way indicated when so doing that mandatory tax withholdings should be excluded from earned income or calculated as augmentations to the $75.00 disregard. The inclusion of mandatory tax withholdings within "income" as that word is used in 42 U.S.C. § 602(a)(7) and within "earned income" as those words are used in 42 U.S.C. § 602(a)(8), and the further inclusion of those withholdings within the flat $75.00 disregard, may produce the results predicted by critics of the proposals enacted into law by Congress in 1981. However, whether those views are or are not meritorious and whether those results do or do not meet the needs of our society, this Court may not disregard the intent of Congress. Accordingly, plaintiff's quests for injunctive and declaratory relief will be denied.

---

The Administration would set *standard caps on work expenses of $75 per month for work expenses (tax,* transportation, uniforms, supplies, etc.) and $50 per month per child for day care. These caps do not reflect the real cost of working . . . .

Hearings Before the Senate Committee on Finance, *supra* note 15, at 227. (emphasis added).

2) *The amount of work-related expenses a parent can claim would be limited by setting a standard maximum deduction for these costs regardless of whether actual expenses incurred were greater.* Currently a working parent can deduct all *actual* work-related expenses (such as transportation, child care, supplies, and *taxes*) from earned income before her AFDC eligibility and grant levels are calculated. . . .

*Budget Issues for Fiscal Year 1982: Hearings Before the Committee on the Budget, House of Representatives,* Vol. 1, 97th Cong., 1st Sess. 419–20 (1981) (emphasis added).

The statements of witnesses before the congressional committees prior to the passage of the 1981 legislation may well constitute only "weak evidence." 2A C.D. Sands, *supra,* at § 48.10. However, in any event, those statements seem merely to highlight what appears to be clear, though warmly debated, legislative and regulatory history.

17. *See Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); *Van Lare v. Hurley,* 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975); *Reyna v. Vowell,* 470 F.2d 494, 496 (5th Cir.1972); *Gilliard v. Craig,* 331 F.Supp. 587, 593 (W.D.N.C.1971), *aff'd,* 409 U.S. 807, 93 S.Ct. 39, 34 L.Ed.2d 66 (1972); *Solman v. Shapiro,* 300 F.Supp. 409, 415 (D.Conn.), *aff'd,* 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969).